UNITED FOOD AND COMMERCIAL
WORKERS INTERNATIONAL UNION,
AFL–CIO, LOCAL 150–A, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Dubuque Packing Company,
Inc., Intervenor.

No. 88–1084.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 2, 1989.

Decided Aug. 4, 1989.

Eugene Cotton, with whom Irving M. King, Chicago, Ill., Robert H. Nichols, and George R. Murphy, Benson, N.C., were on the brief, for petitioner.

David A. Fleischer, Attorney, N.L.R.B., with whom Howard E. Perlstein, Supervisory Atty., and Aileen A. Armstrong, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., were on the brief, for respondent.

Ray J. Schoonhoven, Chicago, Ill., for intervenor.

Before WALD, Chief Judge, and RUTH B. GINSBURG and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

This case arises out of charges originally filed in 1981 by the United Food & Commercial Workers International Union, AFL–CIO, Local 150–A ("the union"), against Dubuque Packing Company, Inc. ("Dubuque Packing" or "the company") for alleged unfair labor practices. The union accused Dubuque Packing of violating §§ 8(a)(5) and 8(d) of the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. §§ 158(a)(5) and 158(d), when the company transferred part of its operations from its home plant in Dubuque, Iowa, to a new plant in Rochelle, Illinois, without engaging in good faith negotiations. The National Labor Relations Board ("NLRB" or

"the Board"), summarily affirming the decision and adopting the reasoning of the administrative law judge ("ALJ") who first heard the case, determined that the company had no duty to bargain over its decision to relocate. *See* Opinion of the Administrative Law Judge ("ALJ op."), *reprinted in* the Joint Appendix ("J.A.") at 5–99. This decision purported to follow the views expressed by the Board in *Otis Elevator Co.*, 269 N.L.R.B. 891 (1984) ("*Otis II*"), on the ground that the company's decision to relocate "did not turn upon labor costs but upon the long-term improbability of continuing this work in Dubuque." ALJ op. at 79. After reviewing the record in this case, we conclude that the Board's decision reflects a lack of reasoned decisionmaking. For the reasons that follow, we remand the case for further Board proceedings consistent with this opinion.

## I. BACKGROUND

This case focuses on events that transpired in the "hog kill and cut" operations of Dubuque Packing between March and October of 1981, when the company decided to relocate these operations from Dubuque, Iowa, to a newly acquired plant in Rochelle, Illinois. Our analysis, however, hinges on a broader understanding of the events that unfolded at the Dubuque Packing Company during the years prior to and including 1981 in several of the company's departments. In order to assess the merits of the union's claims, it is therefore necessary to set out in some detail the factual background of this case, derived from the ALJ's exhaustive factual findings.

### A. *Factual Background*

The Dubuque Packing Company is a closely-held corporation engaged in meat processing and packaging. The company operated a plant in Dubuque, Iowa, handling beef and pork. During the entire relevant period, the Dubuque plant was covered by a collective bargaining agreement between the company and the union that was initially in effect from September 1, 1979, through September 1, 1982, and which, after being amended on August 26,

1980, and October 19, 1981, was extended to September 1, 1983.

The company had been suffering, by all accounts, serious losses since as early as 1977. During the summer of 1978, the company first submitted to the union's executive board a proposal for a "buy-back" of certain contractual entitlements won by the union, under which employees would agree to produce at higher rates in exchange for a one-time cash payment, in order "to counteract 'the excessive cost of [its] wage incentive program' and thereby reduce existing losses and save jobs." ALJ op. at 7. This buy-back was ultimately agreed to by the workers, and it became effective as of November 17, 1978.

In 1979, 1980, and 1981, the financial pressures facing the company intensified. In 1979, for example, the company apparently lost $8 million. On June 10, 1980, Dubuque's assistant corporate director of labor relations sent a letter to the union president informing him, pursuant to a provision in the collective bargaining agreement entitling the union to such notice, that several departments related to beef operations would close effective December 12, 1980. Over the summer of 1980, the parties met concerning these departments. On July 30, company president Charles E. Stoltz addressed union representatives. In his remarks, he treated the decision to move the beef and allied departments as a done deal, but indicated that the company was continuing to review each of the remaining operations to ensure that all possible options were explored to guarantee the future profitability of the Dubuque plant. J.A. at 288. The most immediate problem, he continued, was the future of the company's entire pork operation. As the ALJ put it:

> Unless the Company and employees collectively could find some way to stop the tremendous losses incurred on pork in recent years, the Respondent's pork operations would go the same way as its beef operations. In many departments, although the Respondent was paying incentives above the top wages and fringes in the industry, production was less than that of the competition. The Respondent

must be able to get top productivity for what it was paying in order to compete. ALJ op. at 12. In the president's words, "The *main problem* is the fact that we have to pay a premium to get full production from our employees." J.A. at 288 (emphasis added). Stoltz noted that the company's banks no longer believed the company's promises that it could turn things around to make the Dubuque operation profitable. He then continued:

> We can save the plant and its jobs, but it will take surgery to do it. You have to believe me about that. We want to eliminate the incentive plan by November 1, 1980, and make the necessary contract changes to obtain top productivity per man hour for every department in the plant. . . . If you are willing to work with us and take a positive approach to the matter, we believe that the plant will remain and be profitable. If you take a negative approach . . . , then the future of this plant is clear—it will close. The future of this plant and its 2,000 plus jobs will be decided not by management alone but by the concerted action of the management, the Union leadership and the other 2,000 employees.

ALJ op. at 12. The company pressed the union for a decision by September 1, 1980, on its proposal to eliminate incentive pay.

On August 21, 1980, while negotiations were underway, Stoltz sent a written pledge to the union to gain acceptance of the company's proposal. The pledge was offered "[a]s an indication of the Company's belief that this proposal will meet its needs," with a promise that if production levels were maintained, "the Company [would] not request or demand any additional contract revisions during the life of the present labor agreement." ALJ op. at 13.

Shortly after receipt of this letter, the concessions were agreed to, saving the Dubuque plant approximately $5 million annually. ALJ op. at 14.

The next month, September 1980, the supposedly final decision to close the beef kill department was taken up once again at

the request of the union. The company responded by raising the issue with its lead bank, reporting to the union that "while [the banks] would not give [the company] a definite answer at this time, they did indicate that they would give it serious consideration providing certain conditions were met." ALJ op. at 15. Stoltz indicated that "one of the problems we would encounter in operating the [beef] kill at Dubuque is a lack of operating capital due to the additional monies now needed for the Illinois operation." *Id.* On October 29, President Emeritus Robert C. Wahlert expressed his concern to the union over the future of the Dubuque plant on the eve of the elimination of the incentive pay system, noting that this change would "not in itself be a cure-all," but that it was "a big step forward and we are halfway home, but we are still short $4 million just to break even. It is absolutely essential that we work together...." ALJ op. at 15. The company promised to see what it could do to obtain additional capital to maintain the beef operations; and while the company announced that the beef kill would not close as planned in December, it could not promise more than that the beef kill would remain open on a month-to-month basis.

In the ensuing months, the company's banks became increasingly reluctant to extend credit to the company. In December 1980, the company was notified that its consortium of banks was unwilling to extend additional credit to Dubuque Packing, which, as the ALJ pointed out, meant a rejection of a $5 million loan sought by the company to modernize its Dubuque plant, "presenting a major problem to the [company] in continuing at Dubuque." ALJ op. at 69 n. 94. On January 15, 1981, the lead bank called Dubuque Packing's ten-year $10 million loan, but waived default until March 31. ALJ op. at 70 & n. 97. In early 1981, the company sought to increase the chain speed in the hog kill, effectively raising productivity by increasing the speed at which hogs came down the line for processing.

In March 1981, the company maintained that earlier concessions obtained from the union did not suffice to solve the compa-ny's financial difficulties. The company therefore again sought to increase the chain speed in the hog kill department by approximately 15%. The union refused to agree to this or any other additional concessions.

On March 30, 1981, the company made an announcement that put in motion the events directly at issue in this case: it gave six months' notice, as required by the contract, of its intention to "close" the hog kill and hog cut departments in its Dubuque plant for "economic reasons." The announcement explained that "[t]he costs associated with operating these departments are too high for the Company to remain competitive with its pork products." J.A. at 319. On March 31, Dubuque Packing's banks formally terminated the company's revolving credit agreement; the company was also compelled to repay in full its $10 million long-term loan. ALJ op. at 71. At this time, Dubuque Packing undertook an extended but ultimately unsuccessful quest for additional financing from other banks. Earlier, the company had submitted a request to the Economic Development Administration for a "grant/loan package" of $5 million to finance capital improvements to the Dubuque plant; the application was later rejected. ALJ op. at 72 n. 103.

On April 3, the company mailed to each employee an announcement articulating the reasons for its decision to "close" its operations. The company included a statement noting that "pork slaughterers who were paying $16.00 per hour were going out of business, while those who are paying $8.00 per hour will use this advantage to expand in the hog slaughter business." ALJ op. at 19. The local union in turn sent copies of these materials to its international union, which responded with an analysis of the pork slaughter industry indicating that pay cuts would not solve the industry's more far-reaching underlying problems. *See* ALJ op. at 21. During April and May the union did not seek discussion of the "closing."

On May 22, 1981, a company "Special Memo" was apparently retrieved from a trash can and published in a local newspa-

per. The memo was marked "Confidential!" but it stated the company's willingness "to discuss the possibility" of "concessions to keep the hog kill" that would have to be acted on by July 1. While indicating that the company's losses were so severe that concessions in one department alone could not suffice, the memo conveyed a company view that concessions with a "plantwide impact" would do the trick. J.A. at 537; ALJ op. at 20. The newspaper article also stated the company's view that "the shut down was due to 1980 operational losses of $6.2 million, much of which was attributable to labor costs." ALJ op. at 21. The company's corporation counsel indicated that "if the plant became competitive in its labor costs, the company believed the Dubuque plant would survive as a production facility." *Id.*

On June 1, 1981, the company responded to an offer by the Chamber of Commerce to mediate differences with the union, stating that *"[i]f the Union and its members would agree to a plant-wide wage freeze between now and September 1, 1982, the company would revoke the announced closing of the Hog Kill and Cut departments."* ALJ op. at 22 (emphasis added). Indeed, in exchange for the wage freeze, the company stated that it "would guarantee to continue Hog Kill and Cut Operation for the balance of the labor agreement," and it "would cancel the announced closing of the Beef Operation which [was then] operating on a month to month basis." ALJ op. at 22. (These assurances to the union were given not on the basis of any firm commitments from banks, but rather by Stoltz' belief, which by all accounts was sincerely and firmly held, that the banks would respond to savings from the proposed wage freeze with further extentions of credit. ALJ op. at 26 n. 37.)

At a June 8 meeting between the parties, the idea of a wage freeze was formally proposed, with the company demanding a response by July 1. ALJ op. at 24. On June 9, the union membership rejected the proposal.

On June 10, the company issued a press release stating that it had been informed of the union's rejection of its proposal, and that "[s]ince the rejection appears to be clear, the Company regards the July 1 deadline for an answer as no longer binding on the Company, and it will proceed with its scheduled plans to discontinue the Hog Kill and Cut Operations." J.A. at 337. The press release continued with what proved to be a shocker for all but those privy to the secrets of the company: the company revealed for the very first time to both the union and the public its "alternative plan" to *relocate* rather than simply close portions of its operations, and that more jobs than were originally envisioned—involving perhaps as many as 1,400 employees—were at stake. The company, it turned out, had options to lease two slaughtering and processing plants which would expire on July 3—making the July 1 deadline more real than it might have seemed to the union when it thought the company had pulled the date from thin air. As events would unfold, these two options were ultimately allowed to expire, because of a separate arrangement that was also set in motion on June 10: the company first arranged an appointment to inspect the Rochelle plant that it would, in due time, purchase.

As the ALJ stated his interpretation of events, it was not until the announcement of the proposed transfer of work to a different plant that "the Union realized how much more severe had been the consequences of rejecting the Respondent's wage freeze proposal then [*sic*] had been previously made known by the Company." ALJ op. at 26. The union officials "had no way of knowing whether the 8 June concessions then being requested were justified,"[1] and hence the leadership of the Un-

---

1. Because the company was a closely-held corporation about which the union had no information, the ALJ apparently accepted the genuineness of the union's need to obtain this information from the company directly. Moreover, the ALJ's discussion appears to be sympathetic to the union's need for the broad scope of the information requested, apparently accepting the union's position that "in order to intelligently determine its position with regard to the contract concessions then being demanded, the Un-

union responded by requesting detailed financial information about all the company's operations. ALJ op. at 27 & n. 39. The company balked at the extensive request, stating that it was "so extensive as to be unreasonable both as to subject matter and volume...." ALJ op. at 31.

While the union leadership pursued its strategy with the company, the majority of union members apparently reacted somewhat differently to the news of the company's alternate plan to continue its hog kill operations in a different location. For them, this announcement changed the circumstances, and they circulated a petition to resubmit the previously rejected company proposal for a wage freeze to a second vote. In response to these efforts, a special union meeting was scheduled for June 28.

Despite the apparent finality of the company's June 10 withdrawal of its proposal and its cancellation of the July 1 deadline for acceptance of the offer, the company once again joined the fray in a June 24 memorandum sent to all union members. In the memorandum, the company stated, "If you are allowed to vote [to freeze wages], *your vote will decide whether or not the Company closes the hog kill and cut departments as well as reduces the processing operations at this plant.* If the Company's proposal is rejected, some 1400 jobs will be lost from this plant and transferred to other plants." ALJ op. at 30 (emphasis added).

At the June 28 membership meeting, which was attended by over 2,000 people, the union leadership recommended that the company's wage freeze/profit sharing proposal be rejected until after the union had been afforded the opportunity to review the company's books. In the end, the membership agreed, voting overwhelmingly to deny the company the concessions it sought.

On July 1, the company informed the union that "its previously announced decision to close the Hog Kill and Cut departments is irrevocable." J.A. at 353. The company reiterated that the actions were

ion would require an overview of the Compa-

"motivated solely by economic factors." ALJ op. at 34.

On July 2, a company vice-president told a reporter that the Rochelle plant was going to be a replacement for the hog processing operations at the Dubuque plant, and that the reason for the transfer was the high level of labor costs at Dubuque. ALJ op. at 63. During the next few months, the company sought wage reductions to stave off a total shutdown in Dubuque. On September 28, during discussions with the union, the same company officer stated his view that "[t]here was reason to be glad that [the wage freeze/profit sharing] proposal had not been accepted as the Company could not have made it at that figure." ALJ op. at 51.

On October 1, 1981, hog kill and hog cut operations commenced in Rochelle. Two days later, hog kill and hog cut departments were closed at the Dubuque plant, and approximately 530 employees were laid off. The remaining employees later agreed to a wage reduction in exchange for a contract extension. However, the company's hopes for new financing collapsed in early 1982. The Dubuque and Rochelle plants were closed and sold on October 15, 1982. ALJ op. at 67.

B. *Procedural History*

The union filed charges with the Board on June 26 and August 7, 1981, which resulted in a consolidated complaint issued by the NLRB's General Counsel on April 28, 1982. In September and October 1982, and again in October and November 1983, hearings were held before an ALJ. On March 20, 1984, final briefs were filed with the ALJ. Over one year later, on June 17, 1985, the ALJ released his decision, recounting the facts above and then nevertheless concluding, on the authority of the Board's decision in *Otis II* (discussed at length below)—a decision that was released after final briefs had been filed in the present case—that the relocation of the hog kill and cut to Rochelle did not turn on

ny's entire financial picture." ALJ op. at 29.

labor costs, but rather "clearly turned on a fundamental change in the scope nature and direction of the Respondent's business":

> [W]hile labor costs clearly were a factor in the Respondent's decision to relocate the hog kill and cut work from Dubuque to Rochelle, and where [*sic*] the Respondent repeatedly maintained that its Dubuque employees' wages and benefits were placing it at an economic disadvantage, the Respondent's decision to relocate did not turn upon labor costs but upon the long-term improbability of continuing this work in Dubuque. The Respondent, as noted, had been unsuccessful in raising either from the banks or from the Economic Development Administration the additional $5 million deemed necessary to modernize the Dubuque plant, and had been incurring heavy losses for years. The Respondent's credit line had been lost and its future financing was uncertain. By relocating its hog kill and cut to Rochelle, it could acquire a smaller, newer, more modern plant, better laid-out, with the advantage of having all operations located on a single floor. This was in contrast to the five-story building in Dubuque. Also, the smaller slaughter operation projected at Rochelle was more in line with the Respondent's diminished needs. These facts establish that the Respondent's relocation of the hog kill and cut to Rochelle clearly turned on a fundamental change in the scope nature and direction of the Respondent's business of which labor costs were but a single important factor.

ALJ op. at 79–80 (footnotes omitted). As a result, the ALJ held that the company had no duty to negotiate with the union over its decision to relocate. The ALJ expressly found that some of the company's actions during the relevant period—notably, its policy of "misinform[ation]" and "disinformation" regarding its intention to transfer rather than simply close down operations,

*see* ALJ op. at 81 & n. 124, as well as its resistance to sharing financial information with the union, *see* ALJ op. at 85 n. 132— would fall far short of the standards expected under "good faith" negotiations prescribed by the NLRA,[2] but determined that these findings were of no moment inasmuch as a duty to negotiate in good faith never arose.

More than two additional years passed before a three-member panel of the NLRB on December 16, 1987, summarily affirmed the ALJ's decision. 287 N.L.R.B. No. 52 (1987). Two of the members expressly noted their determination that "under any of the views expressed in [*Otis II*], the [company] was not obligated to bargain with the Union over its decision to relocate unit work from its Dubuque plant to its Rochelle plant." *Id.* at 1 n. 1.

### C. *The Petition for Review*

▮▮▮▮ Shortly after the release of the Board's Decision and Order, the union filed this petition for review. The issue presented in this case, formulated in its most far-reaching terms, is whether the NLRA imposed a duty on Dubuque Packing to negotiate in good faith with the union over its decision to relocate its operations to the Rochelle plant, or whether instead this decision was one the company was free to implement unilaterally. Stated another way, the question is whether the company's decision was a "mandatory" or simply a "permissive" subject of bargaining under the Act. As a practical matter, the implications of this denomination are not insubstantial. Among other things, categorizing a matter a mandatory subject will require an employer to bargain in good faith with the union to the point of impasse before implementing a change, and will authorize the union to use the economic weapons at its disposal to back up its demands at the negotiating table. *See* McGuire, "Management's Right to Relocate Its Plant and to Make Similar Decisions: Recent Develop-

---

**2.** We note from the outset that our analysis in this case proceeds from the ALJ's unchallenged finding that whatever else transpired at Dubuque Packing during the period at issue, there was no anti-union animus infecting the company's decisionmaking. If such animus had been present, the analysis would of course be considerably different. *See* 29 U.S.C. § 158(a)(3).

ments," 38 Lab. L.J. 747, 747–48 (Dec. 1987). The pivotal legal issue is whether the decision to relocate involved "terms and conditions of employment," 29 U.S.C. § 158(d), over which the NLRA requires bargaining, 29 U.S.C. § 158(a)(5). The Board has primary responsibility for applying the general provisions of the NLRA, and where its interpretation of what the Act requires is reasonable, in light of the purposes of the Act and the controlling precedent of the Supreme Court, courts should respect its policy choices. *See Pattern Makers' League of North America v. NLRB,* 473 U.S. 95, 105 S.Ct. 3064, 87 L.Ed.2d 68 (1985); *Automobile Salesmen's Union Local 1095 v. NLRB,* 711 F.2d 383 (D.C.Cir.1983). In conducting its review, this court will uphold the order of the Board unless, reviewing the record as a whole, it concludes that the Board's factual findings are not supported by substantial evidence on the record considered as a whole, 29 U.S.C. § 160(f), or that the Board acted arbitrarily or otherwise erred in applying established law to the facts at issue. *See C.J. Krehbiel Co. v. NLRB,* 844 F.2d 880, 882 (D.C.Cir.1988); *United Food and Commercial Workers Int'l Union Local 152 v. NLRB,* 768 F.2d 1463, 1469 (D.C.Cir.1985).

## II.  SUPREME COURT PRECEDENT

The Supreme Court has twice spoken to issues directly related to the one present here, and we turn first to those decisions for guidance in understanding the scope of the general duty imposed by the NLRA to "confer in good faith with respect to wages, hours, and other terms and conditions of employment." The first important decision was *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). In that case, an employer allowed its contract with maintenance employees to expire, notifying them four days prior to expiration that it had decided to subcontract its maintenance work in order to reduce expenses. The Court took up the question whether a decision to contract out employment to workers outside the bargaining unit, while unit members were available and capable of performing the work, fell within the bargaining duty imposed by the NLRA. The Court noted that the literal words of § 8(d)—"terms and conditions of employment"—covered this situation, since the decision dealt with termination of employment, a consequence that "necessarily results from the contracting out of work performed by members of the established bargaining unit." 379 U.S. at 210, 85 S.Ct. at 403. The Court went on to note that the company's decision to contract out the maintenance work did not in any fundamental sense alter the company's basic operation: "[T]he Company merely replaced existing employees with those of an independent contractor to do the same work under similar conditions of employment. Therefore, to require the employer to bargain about the matter would not significantly abridge his freedom to manage the business." *Id.* at 213, 85 S.Ct. at 404. The Court continued:

> [I]t is contended that when an employer can effect cost savings in these respects by contracting the work out, there is no need to attempt to achieve similar economics through negotiation with existing employees or to provide them with an opportunity to negotiate a mutually acceptable alternative. The short answer is that, although it is not possible to say whether a satisfactory solution could be reached, national labor policy is founded upon the congressional determination that the chances are good enough to warrant subjecting such issues to the process of collective negotiation.

*Id.* at 214, 85 S.Ct. at 404. In the years following *Fibreboard,* the Board read this language as capaciously as it was apparently intended, consistently holding that relocation of work from one plant to another was a mandatory subject of bargaining. *See, e.g., Tocco Division of Park Ohio Industries,* 257 N.L.R.B. 413 (1981), *enf'd,* 702 F.2d 624 (6th Cir.1983); *Otis Elevator Co. (I),* 255 N.L.R.B. 235 (1981); *Donn Products Inc.,* 229 N.L.R.B. 116 (1977), *enf. granted in part and denied in part,* 613 F.2d 162 (6th Cir.1980), *cert. denied sub nom. United Furniture Workers v.*

*Donn Products, Inc.,* 447 U.S. 906, 100 S.Ct. 2988, 64 L.Ed.2d 855 (1980).

In 1981, the Supreme Court's broad reasoning in *Fibreboard* was narrowed somewhat by the Court's decision in *First National Maintenance Corp. v. NLRB,* 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981). There, the Court addressed the question whether an employer must negotiate with the certified representative of its employees over its decision to close a part of its business. The termination of the operations at issue—a contracted out cleaning business for nursing homes—"was purely a matter of money." 452 U.S. at 669–70, 101 S.Ct. at 2575–76. The Court picked up on Justice Stewart's three-part categorization of management decisions (spelled out in his concurrence in *Fibreboard*):

> Some management decisions, such as choice of advertising and promotion, product type and design, and financing arrangements, have only an indirect and attenuated impact on the employment relationship. Other management decisions, such as the order of succession of layoffs and recalls, production quotas, and work rules, are almost exclusively "an aspect of the relationship" between employer and employee. The present case concerns a third type of management decision, one that had a direct impact on employment, since jobs were inexorably eliminated by the termination, but had as its focus only the economic profitability of the contract with Greenpark, a concern under these facts wholly apart from the employment relationship.

*Id.* at 676–77, 101 S.Ct. at 2579–80 (citations omitted). The Court concluded that "[t]his decision, involving a change in the scope and direction of the enterprise, is akin to the decision whether to be in business at all, 'not in [itself] primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment.'" *Id.* at 677, 101 S.Ct. at 2580 (quoting *Fibreboard,* 379 U.S. at 223, 85 S.Ct. at 409 (Stewart, J., concurring)). The benefits of collective bargaining will accrue, the Court continued,

> only if the subject proposed for discussion *is amenable to resolution through the bargaining process.* Management must be free from the constraints of the bargaining process to the extent essential for the running of a profitable business. It also must have some degree of certainty beforehand as to when it may proceed to reach decisions without fear of later evaluations labeling its conduct an unfair labor practice.... [I]n view of an employer's need for unencumbered decisionmaking, bargaining over management decisions that have a substantial impact on the continued availability of employment should be required *only if the benefit, for labor-management relations and the collective-bargaining process, outweigh the burden placed on the conduct of the business.*

*Id.* 452 U.S. at 678–79, 101 S.Ct. at 2580–81 (emphasis added, footnote omitted). The Court ultimately determined in *First National Maintenance* "that the harm likely to be done to an employer's need to operate freely in deciding whether to shut down part of its business purely for economic reasons outweighs the incremental benefit that might be gained through the union's participation in making the decision." *Id.* at 686, 101 S.Ct. at 2584. In a footnote, the Court stated, "In this opinion we of course intimate no view as to other types of management decisions, such as plant relocations, ... which are to be considered on their particular facts." *Id.* n. 22.[3]

---

**3.** At the end of its opinion, the Court turned to the specific facts of the case before it "[i]n order to illustrate the limits of our holding." 452 U.S. at 687, 101 S.Ct. at 2585. The Court noted, *inter alia,* that the critical factor contributing to the employer's economic loss was the size of a management fee that it was required to pay—and the Court pointedly observed that "[t]he union had no control or authority over that fee." *Id.* The Court further pointed out that the employer's decision to close this part of its operations marked a more fundamental alteration in the overall course of its business than the employer's decision in *Fibreboard:* "The decision to halt work at this specific location represented a significant change in petitioner's operations, a change not unlike opening a new line of business or going out of business entirely." *Id.* at 688, 101 S.Ct. at 2585.

### III.  NLRB PRECEDENT: *Otis II*

The Board originally decided a case involving the Otis Elevator Company on March 25, 1981, consistently with its earlier cases finding relocation to be a mandatory subject of bargaining: the Board held that Otis Elevator's decision to discontinue portions of its research and development activities and consolidate the remainder in a new operation had be to negotiated with its union.  *Otis Elevator Co. (I),* 255 N.L.R.B. 235 (1981).  While that decision was on review before this court, we granted the Board's motion to remand the case to the Board "for reconsideration in light of" *First National Maintenance.*

#### A.  *The Board's Decision*

The Board's reconsideration yielded three separate opinions, proposing three separate tests for determining whether a decision is a mandatory subject of bargaining.  The plurality opinion, representing the views of two out of the four participating Board members (Chairman Dotson and Member Hunter), held that "the critical factor to a determination whether the decision is subject to mandatory bargaining is the essence of the decision itself, *i.e.,* whether it turns upon a change in the nature or direction of the business, or turns upon labor costs; *not* its effect on employees nor a union's ability to offer alternatives."  269 N.L.R.B. at 892 (emphasis in original).  The line drawn by the plurality appears to be designed to favor and protect management prerogatives, giving special weight to the Supreme Court's solicitude in *First National Maintenance* for "an employer's need for unencumbered decision-making."  452 U.S. at 679, 101 S.Ct. at 2581.  In addition, the plurality eschewed the use of labels to determine whether a management decision would be subject to a duty of mandatory bargaining, preferring instead to emphasize the verbal formulation that would impose such a duty on "all decisions which *turn upon a reduction of labor costs* ... whether the decision may be characterized as subcontracting, reorganization, consolidation, or relocation...."  *Id.* at 893 (emphasis added).  On the facts

before it, the plurality determined that Otis Elevator had been under no duty to bargain with employees to move its research operations, because the decision was motivated by factors other than labor costs: the technology at the old plant was outdated, the plant facility was duplicative of other Otis operations, and Otis was seeking to consolidate and streamline its work at a newer and larger facility.

Member Dennis picked up *First National Maintenance's* balancing more directly, concurring in the plurality's result but concluding that a decision to relocate was mandatory *if* the General Counsel can establish two points.  First, it must be shown that a factor over which the union has control was a significant consideration in the employer's decision.  As Member Dennis explained this element, this question would seek to ascertain whether a "union is in a position to lend assistance or offer concessions that reasonably could affect—*i.e.,* make a difference in—the employer's decision," 269 N.L.R.B. at 897.  The question was designed to reveal whether the subject was, in the Supreme Court's words, "amenable to resolution through the bargaining process."  452 U.S. at 678, 101 S.Ct. at 2580.  Second, if a decision is amenable to bargaining, Member Dennis would still impose a bargaining duty " '*only if* the benefit, for labor-management relations and the collective bargaining process, outweighs the burden placed on the conduct of the business.' "  269 N.L.R.B. at 897 (quoting *First National Maintenance,* 452 U.S. at 679, 101 S.Ct. at 2581 (emphasis added by Member Dennis)).  For this inquiry, Member Dennis deemed the fact that a decision would be amenable to bargaining to be a "benefit" per se; she then outlined the factors pointed to by the *First National Maintenance* Court as relevant to weighing the "burdens" on management: the extent of capital commitment; the extent of damages in operations; and the need for speed, flexibility, and confidentiality.

Member Zimmerman concluded in a separate concurrence that bargaining should be held mandatory when the decision is "amenable to resolution through collective bargaining"—that is, when "union concessions

may substantially mitigate the concerns underlying the employer's decision, thereby convincing the employer to rescind its decision." 269 N.L.R.B. at 901. In effect, Member Zimmerman's test would impose a duty to bargain when the first inquiry under Member Dennis' test is answered in the affirmative. Member Zimmerman forthrightly acknowledged that under his standard, a duty to bargain could arise even "where the employer's decision is related to overall enterprise costs not limited specifically to labor costs." *Id.*

These disparate opinions are set out in some detail because each of them retains vitality more than five years after they were first released. In subsequent cases, the Board has not definitively chosen one or the other standard, but has instead found that the cases coming before it satisfy either all or none of the *Otis II* tests. *See, e.g., FMC Corp.,* 290 N.L.R.B. No. 62, 7 (1989); *Connecticut Color, Inc.,* 288 N.L.R.B. No. 81, 3 n. 3 (1988) (view of Chairman Stephens and Member Babson). Once again, in the present case two members expressly based their decision to summarily affirm the ALJ's opinion on the ground that the company was not obligated to bargain with the union "under any of the views expressed" in *Otis II.* The Board apparently believes that the cases it has

faced since *Otis II* have all so far fallen clearly on one side or the other of the various opinions in *Otis II,* and that none of the intervening cases has required the Board to focus attention on or to make a choice between the divergent views expressed therein.

### B. *The Reasonableness of the Otis II Approach*

The union in this case has mounted a full-scale attack on the approach of *Otis II* on its face, charging that it is inconsistent with *First National Maintenance.* While it is clear that the controlling Supreme Court opinions do not compel the Board's approach(es) in this regard,[4] the proper question for this court is whether the Board's approach is a reasonably defensible reading of the statute, one that is consistent with the Supreme Court's decisions construing the duty to bargain thereunder. The Fifth Circuit has dealt squarely with this issue, *see Local 2179, United Steelworkers v. NLRB,* 822 F.2d 559 (5th Cir. 1987), and has produced a comprehensive and cogent opinion finding that *Otis II* reasonably interprets the NLRA.[5] The union now invites this court to create a split in the circuits, but we respectfully decline its invitation.[6]

**4.** In its Reply Brief, the union engages in a peculiar hyperliteral approach to interpreting the Supreme Court's *First National Maintenance* opinion, arguing that when the Court stated that it intimated nothing about relocations, it in fact affirmatively sought to forbid future Board changes in the treatment of relocation decisions. As noted earlier, the Supreme Court's statement, in pertinent part, was as follows: "In this opinion we of course intimate no view as to other types of management decisions, such as plant relocations, ... which are to be considered on their particular facts." 452 U.S. at 686 n. 22, 101 S.Ct. at 2584 n. 22. Our reading of this statement, apparently in contrast to the union's, would understand the Supreme Court to have meant what it said: its holding that partial closings are not mandatory bargaining subjects was intended neither to compel nor to forbid a similar approach in other factual contexts. Here, we confront a different factual context, and the Board has adopted an approach that is different from that adopted for partial closings, but which is nevertheless not inconsistent with the principles relied upon in *First National Maintenance.* And it should be noted

that the Board's decision in *Otis II* does not operate from the premise that its result was compelled by *First National Maintenance;* rather, it simply recognizes that *First National Maintenance* readjusted the balance that the Board used in dealing with cases of this nature.

**5.** We note at this juncture our one significant disagreement with the Fifth Circuit: their apparent understanding that the plurality opinion in *Otis II* has somehow become the dominant, binding opinion of the Board. *See Local 2179,* 822 F.2d at 576. We have been unable to uncover the case in which the Board has so elevated the plurality's test.

**6.** The *Otis II* test was also mentioned—and criticized—in the Fourth Circuit's recent case of *Arrow Automotive Industries, Inc. v. NLRB,* 853 F.2d 223 (4th Cir.1988) as not following closely enough the teachings of *First National Maintenance.* In *Arrow,* the court determined that the events at issue did not constitute a relocation, but rather represented a partial closing. Despite the court's explanation that its decision was "not dependent on a 'partial closing' label,"

As noted at the beginning of our discussion, our general approach to a Board construction of the NLRA is quite deferential.

> Because it is evident that Congress assigned to the Board the primary task of construing these provisions in the course of adjudicating charges of unfair refusals to bargain and because the "classification of bargaining subjects as 'terms or conditions of employment' is a matter concerning which the Board has special expertise," its judgment as to what is a mandatory bargaining subject is entitled to considerable deference.

*Ford Motor Co. v. NLRB*, 441 U.S. 488, 495, 99 S.Ct. 1842, 1848, 60 L.Ed.2d 420 (1979) (citation omitted). *See also NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 1149–50, 10 L.Ed.2d 308 (1963) (noting that courts must afford appropriate deference to the Board's expertise in "applying the general provisions of the Act to the complexities of industrial life"). If the Board's construction of the statute is "reasonably defensible," *Ford Motor Co.*, 441 U.S. at 497, 99 S.Ct. at 1849, it should not be rejected merely because the court might prefer another view of the statute. Moreover, the available Supreme Court precedent does not offer decisive support for any one approach to the question of relocations: each of the *Otis II* approaches gives at least a plausible reading to the requirements of *First National Maintenance*.[7] Given this legal ambiguity surrounding NLRA terms that are themselves intentionally vague in order to allow for Board interpretation, this court's stance is at its most deferential.

The case for *Otis II*'s reasonableness as it bears on decisions to relocate work begins with an analysis of the component parts of a decision to relocate: on the one hand, the decision to close permanently one plant, and on the other hand a decision to acquire and to set up operations elsewhere. The former decision is analytically close to *First National Maintenance*. As the Fifth Circuit noted, "The addition of the second decision"—which is the sort of decision normally thought to lie at the core of entrepreneurial control—"does not enhance the adverse effects on the employees at the closed facility." 822 F.2d at 578. Without some reason to think that bargaining over this decision would in some meaningful way contribute to the policies undergirding the NLRA, it is difficult, in light of *First National Maintenance*, to argue that the decision to relocate per se creates a duty to bargain.

In fact, given the *First National Maintenance* Court's sensitivity to management prerogatives, it is difficult to maintain that the Board was *required* by that opinion to come up with an approach to relocations that would even insist on bargaining *anytime* labor costs are "a factor," no matter how small, so long as the decision was a close enough one that labor costs might have tipped the scales. That is not to say that such an approach would not have been reasonable. Rather, it is simply to say that this is not the only permissible approach under *First National Maintenance*. Ascertaining whether or not a decision to relocate "turns upon labor costs," or whether it is "amenable" to collective bargaining, provides acceptable, albeit restrict-

---

853 F.2d at 230, the court's reasoning hinged on its conclusion that *First National Maintenance* was strictly controlling, *Otis II* notwithstanding. As a logical matter, this holding is possible under the language of *First National* itself only because the Fourth Circuit determined that the closing at issue was *not* one of the "other types of management decisions" on which the Supreme Court had expressly "intimate[d] no view." 452 U.S. at 686 n. 22, 101 S.Ct. at 2584 n. 22. The Fourth Circuit's reasoning thus has little bearing on the issues before us today, for we conclude that outside the context of partial closings the Supreme Court left the Board the discretion to strike a somewhat different bal-

ance in determining whether management decisions are mandatory subjects of bargaining.

7. *See Local 2179*, 822 F.2d at 576:

> These varied readings of *First National Maintenance's* requirements by the Board members, together with those of legal writers, suggest—even if it can be assumed that the opinion mandates a particular analytical framework for other cases—that the Court did not delineate a specific methodology or process for the Board that is so unambiguous and plain as to deprive the Board of all discretion in determining how to decide future cases.

ed, proxies for identifying management decisions that do not require special "speed, flexibility, and secrecy," and which would be fruitful subjects of negotiations between management and labor.

What the *Otis II* standard lacks by way of under-emphasis of mandatory bargaining, it arguably compensates for with greater simplicity and predictability—perhaps subsidiary, but not altogether unimportant goals under the Act. These are the sorts of factors that courts have long charged the Board with balancing. We conclude that the broad legal views outlined in *Otis II* are reasonably defensible approaches for determining when plant relocations are mandatory bargaining subjects under the NLRA.

### IV. Analysis of the Present Case

Having determined that *Otis II* is not fatally flawed on its face, our inquiry is not over. It remains to determine whether the *Otis* standard, acceptable in its broad outlines, has been properly applied to the particular facts of the case before us. Despite the deference we owe the Board, for reasons that follow, we conclude that its decision in this case falls short of the standards of reasoned decisionmaking that we customarily require in judicial review.

### A. *The Findings of the ALJ*

■ To begin, we address the shortcomings of the ALJ's opinion—analysis that was expressly adopted by the Board.[8] As noted earlier, the ALJ himself invoked the *Otis II* "turns upon" standard to dispose of the present case. And yet at a most basic level, the ALJ's opinion reflects inadequate attention to the critical inquiry posed by this aspect of the *Otis II* approach. In the past, the Board has generally applied the "turns upon" test by ascertaining the basis upon which the relevant decisionmakers ar-

rived at their decision. In *Otis II* itself, the plurality focused on Otis' decision, "[g]ood or bad," grounded in the company's belief that its technology was dated, its product was not competitive, etc. 269 N.L.R.B. at 892 & n. 3. *See also Connecticut Color, Inc.*, 288 N.L.R.B. No. 81, 3 (1988) (holding that a transfer of work was a mandatory subject of bargaining "because the motivation for the shift was to cut labor costs"); *Metropolitan Teletronics Corp.*, 279 N.L.R.B. 957, 958 (1986) (holding that a decision to move did not turn upon labor costs, but rather "was motivated by," *inter alia*, a foreclosure action); *DeSoto, Inc.*, 278 N.L.R.B. 788, 789 (1986) (focusing on whether labor costs were an "operative factor in the [employer's] decision" in deciding whether the decision was amenable to bargaining). While the Board's ultimate determination of whether the management's decision "turned upon" labor costs may depend on an assessment of several different factors, two basic ingredients emerge: the relevant factors must have been contemporaneous with or have pre-dated the decision itself, and the exercise must involve an effort to determine what was actually in the minds of those making the decision.

Despite this framework, the ALJ's opinion (and through the ALJ, the Board) adopts a different approach in this case in that it seeks to *justify* the company's decision rather than examine its genesis. The ALJ's opinion never actually states that anyone who had any responsibility for making the decision to relocate the hog cut and kill ever believed that the decision turned on any factor *other than* labor. Rather, the opinion's critical language states in one conclusory sentence that the company's decision did not turn upon labor costs, and then goes on to list some objective advantages that had been identified as flowing from the decision to move.[9] There is no

---

**8.** Because the three-member panel of the Board summarily "affirm[ed] the [ALJ's] rulings, findings, and conclusions," 287 N.L.R.B. No. 52 at 1 (footnote omitted), the Board is accountable for the ALJ's shortcomings, which have become through express incorporation the shortcomings of the Board. In the next section, we take up issues that arose after issuance of the ALJ's

opinion, for which the Board bears sole responsibility.

**9.** At one point in his opinion, the ALJ explored (and apparently credited) a number of factors that the company identified that rendered the decision to purchase the Rochelle plant superior to other alternatives to business-as-usual at the

intimation in the opinion that these factors were decisive, or significant, or indeed were even *considered* in the actual decisionmaking taking place in the offices of Dubuque Packing between March and July of 1981.[10]

If the Board desires to adhere to the "turned upon" formula as controlling in its relocation-negotiation decisions, it must identify for us the kinds of factors it takes into consideration in determining the employer's contemporaneous motive for its decision, and then apply those factors to the record in this case in order to determine whether the contemporaneous evidence re-

lating to Dubuque's decisionmaking supports the conclusion that the company's decision "turned upon" entrepreneurial factors, rather than labor costs.[11]

Conversely, if the Board has decided to apply a new approach where all that it requires is that the decision be *justified* on the basis of entrepreneurial factors, then we ask the Board to explain why it has made the shift and to identify those factors that will control the determination. The Board should then tell us what aspects of the present record justify its determination.[12] As it is now, we are at a loss to

---

Dubuque plant available to the company in 1981. ALJ op. at 65. To the extent this discussion gives rise to an inference that these comparisons were actually played out in the minds of the relevant company decisionmakers, we simply note that this analysis begs the question, which is not why the company chose one option over another option, but rather why the company chose to change from the status quo in Dubuque. It is this latter question that must be answered in determining what the company's decision "turned upon" and whether it was amenable to bargaining.

10. Indeed, the factual background described in the ALJ's own findings and recounted at the outset of this opinion demonstrates that much of the available evidence points in a contrary direction. We can safely assume that the company's representations to the union during the months at issue give at least *some* indication of what they were really thinking, and those statements emphasized the primary importance of labor costs to the decision to cease pork operations in Dubuque.

One contrary statement we have discovered in the record comes from a letter sent late in the summer of 1981, after the relocation decision had become irrevocable, during the dispute over union access to the company's financial information. Signed by the company's director of labor relations, the letter addressed a statement by the union's auditor that the Dubuque plant had "been suffering losses *attributable to the level of labor costs.*" J.A. at 394 (emphasis in original). This statement was incorrect, the letter explained,

since we have repeatedly informed you of our multimillion dollar losses and said that we needed economic concessions from our unions in order to justify continuing certain operations. We have kept you informed of the many additional steps we have taken to cut costs in ways not linked to our unions. You have been provided this information in letter form over the past year and we will continue to keep you informed.

*Id.* This statement, combined with the company's later view that its proposed wage freeze would not have forestalled relocation, suggests that Dubuque Packing may have had a change of heart from its early 1981 belief that wage concessions were key. We leave it to the Board on remand to determine what weight, if any, should be accorded these after-the-fact statements.

11. The only other hint we have pertaining to the ALJ's reasoning on the company's motivation for relocation is his statement that the company's decision in fact turned "upon the long-term improbability of continuing this work in Dubuque," ALJ op. at 79; he then mentioned the company's heavy losses and its difficulties in obtaining credit. The Board's brief to this court elaborates on this conclusion, describing in detail how unsuccessful the company was during early 1981 in obtaining credit, and urging that this loss of financing was the *real* reason for the decision to move. While inability to obtain financing might in some circumstances provide an alternative valid reason for the company's decision to relocate, without more explanation its mere invocation in the factual context of this case is not sufficient to demonstrate that the relocation did not turn upon labor costs, for "financial difficulties" are not necessarily a factor separate and distinct from labor costs. Rather, the difficulty experienced by Dubuque Packing in obtaining credit (for ongoing business expenses as well as for plant improvement) might well be simply a manifestation of high labor costs. Without *some* further explanation or evidentiary support, we cannot assume that Dubuque Packing's financial difficulties originated in areas other than labor costs.

12. The Board's Brief makes much of the advantages of the Rochelle plant over the Dubuque plant. *See* Br. for the Board at 37 ("The greater efficiency and more modern technology at the Rochelle plant clearly contributed to the relocation decision."). But there is no indication in the opinion of the ALJ that some of the factors

know what kind of standard it is applying or how it is applying that standard to this record.

As it presently stands, the ALJ's opinion repeatedly quotes the company's view during early 1981 that, for example, the union members' vote on the wage freeze proposal would *"decide whether or not the Company closes the Hog Kill and Cut departments."* ALJ op. at 30 (emphasis added). In light of these attention-grabbing passages in his factual narrative, the ALJ's abrupt final conclusion, that Dubuque Packing's decision *did not* turn on labor costs, seems disjointed from the balance of his opinion. Our decision today should not be read to intimate that the ALJ's ultimate determination about the cause of the relocation could not find a reasoned basis in the evidence on the record. But because the ALJ and the Board did not provide us with the reasoning needed to bridge the gap between the background in this case and their dispositive conclusions, we hold that the decision in its current form fails to reflect the reasoned decisionmaking required of administrative agencies.

### B. *The Board's Summary Affirmance*

■ The union makes a broad-based attack on the Board's procedure of affirming and adopting wholesale the reasoning of the ALJ without further elaboration. It is clear, both from our experience and as a matter of principle, that this practice is acceptable as a general matter, for it ordinarily provides (albeit in a manner that is relatively effortless for the Board) sufficient explanation of the basis of the decision both to the parties and to reviewing courts. There is nevertheless merit to the union's claim that the Board bears a responsibility to address issues that arise only after the release of the ALJ's opinion —*i.e.,* to answer questions that appear after it is too late for the ALJ to confront them. Three items in particular were neglected by the Board in this case and will require its attention on remand.

■ First, a majority of the Board took it upon itself to note that the ALJ's holding —namely, that Dubuque Packing was under no duty to bargain over its decision to relocate—was the proper conclusion "under any of the views expressed in [*Otis II*]." We have noted that the Board has in the past consistently declined to choose among the various *Otis II* opinions. Whatever the merits of that approach in earlier cases, we have found it quite confusing in this case. The various *Otis II* opinions do share certain common understandings—*e.g.*, that a decision becomes a mandatory subject when labor costs are the central motivating factor—but beyond that the *Otis II* plurality opinion and concurrences contain some very significant differences. Perhaps most notably, Member Zimmerman's opinion would appear to require bargaining even in circumstances where labor costs were not directly the cause of the relocation decision, but when labor concessions might nevertheless offset the concerns that *are* motivating the decision. As disputes arise, such as the current one, that force the Board to chart a course into the more ambiguous or disputed territory of its *Otis II* test, the Board must accept responsibility for clarifying and identifying the standards that are guiding its decisions. We urge the Board to look seriously at the present case on remand and to attempt to articulate a majority-supported statement of the rule that the Board will be applying now and in

---

mentioned even existed, much less were important in the company's decision to move. The ALJ faithfully recounted the company's evidence which indicated that the Rochelle plant had some advantages over the Dubuque plant, *see* ALJ op. at 66–67, but in the text of his discussion the ALJ also apparently accepted the view that the $27 million spent in the late 1970s to improve the Dubuque plan rendered it "virtually state of the art," diminishing substantially the alleged superiority of the Rochelle plant. Indeed, the subsequent purchaser of the Du-

buque plant reopened it with no changes to the hog kill and cut main chain equipment (although the new company did apparently intend to spend more than $2 million that it, unlike Dubuque Packing, was able to receive from the federal government to remodel the hog kill operation). ALJ op. at 67. Arguably one of the more important pertinent changes made by the new operator was to lower wages dramatically, and to virtually eliminate fringe benefits, while at the same time increasing the chain speed on the floor.

the future in determining whether a particular decision is subject to mandatory bargaining or not.

Failing that, the Board must at a minimum be prepared to explain how it arrived at the conclusion that the *Otis II* opinions could all yield the same result in this case. Members Babson's and Stephens' bare assertion that their outcome conforms to all three *Otis II* opinions stands naked before us, without any elaboration whatsoever. Of course, in some cases even terse explanations will suffice to reveal the critical reasoning underlying a holding. But in this case, the Board has crossed that fatal line between "the tolerably terse" and "the intolerably mute." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C.Cir.1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). It is not at all clear to us how, for example, the Board majority arrived at the conclusion that under Member Zimmerman's test in *Otis II*, the company's decision would not be "amenable" to bargaining, insofar as the company itself actively pursued bargaining at several points during the relevant period. We would certainly not hold as a matter of law that the mere act of voluntarily seeking negotiations with a union imposes an automatic duty to bargain in good faith to impasse over a decision to relocate in every case, but we cannot escape the fact that the voluntary efforts of an employer to engage in negotiations are inherently probative on the question whether the ultimate decision is "amenable" to bargaining—the critical factor under Member Zimmerman's test. In a similar vein, without a more explicit fact-based balancing between the benefits and burdens of negotiations in this case, we cannot perceive the path of reasoning that would lead the Board to conclude that Member Dennis' test was met here—*i.e.*, to determine that in this particular case, the burdens of bargaining outweighed any conceivable benefits. Nothing in the record has been pointed out to us showing that there was any peculiar need for secrecy, speed, or flexibility in Dubuque Packing's decisionmaking. Or perhaps more critically, we find no indication that whatever need for speed, etc.,

*did* exist could not be accommodated within the mandatory bargaining context. It is not this court's role to supply post hoc justifications for the Board's result; the duty to justify lies exclusively with the Board in the first instance. In this case, the Board did not meet its duty.

■ A second weakness lies in the Board's failure to explain how it could reconcile the result that it approved in this case with the results contained in Board decisions released *subsequent* to the ALJ's decision but *prior* to the Board's final decision. When the Board adopts an ALJ opinion that is in tension with intervening Board precedent, a duty arises for the Board to explain the significant conflicts. One case is of particular note in this regard here. *Plymouth Stamping Division*, 286 N.L.R.B. No. 85 (1987), *enf'd*, 870 F.2d 1112 (6th Cir.1989), presents facts that are, on the surface at least, very similar to those in the present case: there, the Board recounted that "the Company's economic problems resulted from a 25–percent decline in sales, noncompetitive wage rates and benefits for parts assembly employees, burdensome Michigan business taxes, and high workmen's compensation and unemployment taxes." *Id.* at 4. When the union asked what could be done to save their jobs, the company listed several wage and benefit concessions that would be necessary. On these facts, contrary to the Board's conclusion in the present case, a panel of the Board determined (over the dissent of Chairman Dotson) that the decision at issue *was* subject to mandatory bargaining, and that this was so "under any of the views expressed in *Otis Elevator....*" *Id.* at 2. We do not mean to intimate that the Board could not rationally find the two cases distinguishable. The Board's counsel points to some arguably plausible points of distinction. But we again state that it is not up to us to imagine what distinctions the Board might have been relying on to decide the present case as it did, in apparent tension with its previous decision in *Plymouth*. The Board's summary disposition of this case reveals no *Board* attention (as opposed to the

attention of its attorneys after the fact) to the possible inconsistencies, and thus we are left with an apparent conflict. *See also Century Air Freight*, 284 N.L.R.B. No. 85, 8–13 & n. 8 (1987).

Finally, a third matter was ignored in the Board's summary disposition of this case. As noted earlier, the ALJ's ultimate conclusion was that the company had failed to bargain in good faith with the union over the decision to relocate operations to Rochelle (by failing to disclose that a relocation was in fact contemplated, and by failing to furnish promptly financial information relevant to the relocation decision), but that these failures were of no moment because the company was under no duty to bargain in the first place. The union argued before the Board, and has pursued the argument before this court, that even if no duty to bargain in good faith arose with regard to the relocation decision itself, such an obligation did arise when the company sought to renegotiate, during the middle of a contract term, certain modifications to a whole host of mandatory subjects—wages, benefits, work pace, etc.[13] The union argues that it is ridiculous to exempt a plenary mid-term discussion of wages and other terms and conditions of employment from a duty to negotiate in good faith simply because the company includes a nonmandatory term.

This issue was not addressed by the ALJ—perhaps somewhat understandably, inasmuch as it arose only as a result of his unique disposition of the case. What is not understandable is why the Board, when squarely confronted with the issue in its review of ALJ's decision, felt that it too was free to ignore the issue. On remand, this issue might drop out of the case if the Board determines, as it is free to do, that it erred the first time around, and that the company *was* under a duty to bargain. If, however, the Board once again concludes

that no duty arose to bargain with the union over the decision to relocate its operations, then the union's claim in this regard will again be before the Board. While we intimate no views on the merits of the issue for final decision, we do note that if the Board's actions on remand do not moot the issue, then we expect that the Board will directly address the question that its disposition of this case presents: notwithstanding the company's freedom to bargain without any good faith obligations when only permissive subjects are brought to the negotiating table, do good faith obligations arise when it brings mandatory subjects to the table as well and seeks concessions on these matters in exchange for company accessions pertaining to permissive subjects? We find no clear answer to this question in the Board's precedent, and thus we leave it to the Board, in its expertise, to confront the claim initially.

## V. DUBUQUE PACKING'S CLAIMS ON APPEAL

Dubuque Packing has participated in this action as an intervenor. Its involvement in that capacity follows an unsuccessful attempt to file a petition in this case for review of Board findings that, although of little consequence to the company in light of the Board's ultimate decision to dismiss the complaint in its entirety, nevertheless went against the company. In an order dated May 19, 1988, this court dismissed Dubuque Packing's petition on the grounds that the company could not show that "it has suffered an 'adverse effect in fact' as a result of the [Board's] order" (citing *Retail Clerks Union 1059 v. NLRB*, 348 F.2d 369, 370 (D.C.Cir.1965)), and that "petitioner can adequately protect its interests through its intervention in the petition for review filed" by the union in this case. The company now attempts to resuscitate its contentions from that action,[14] but we do not

---

**13.** This case is thus quite different from the cases relied on by the Board and the company, *see, e.g., Litton Microwave Cooking Products v. NLRB*, 868 F.2d 854 (6th Cir.1989), in which, following an announcement of a proposed transfer of work, unions pester their companies for information while the companies steadfastly maintain that they have no duty to bargain.

**14.** Dubuque Packing's contentions are several. First, the company offers alternative bases upon which the Board's determination that there was no duty to bargain could be upheld, including a claim that the company had a contractual right to relocate without bargaining, and alternatively that the union waived whatever bargaining rights it had by failing to request negotiations in

consider them for they are not properly before us. In effect, Dubuque Packing anticipates the possibility that the Board will ultimately determine that the company did have a duty to bargain in good faith with the union, and the company seeks to preempt the effects of such a possible finding by litigating new questions that are presently no more than speculative and academic. If the Board decides on remand, in light of this opinion, that Dubuque Packing had no duty to bargain, then any discussion of the merits of these claims at this time would be rendered entirely gratuitous. Conversely, if the Board reverses its prior conclusion and determines that Dubuque Packing *was* under a duty to bargain, *and* reaffirms the findings that the company now complains of (which the Board is of course not bound to do), then the company will become a party suffering an adverse effect in fact from a final order of the Board, and the time will be right for a meaningful appeal to this court. We therefore defer consideration of these claims until such time (if ever) as they are properly presented to us.

### VI. CONCLUSION

This case presents hard questions—indeed, some of the most polarizing questions in contemporary labor law. While we are sympathetic to the task that lies ahead for the National Labor Relations Board, our sympathy does not lead us to shirk our duty to hold the Board accountable for the rationality of its decisions. As it stands, the reasoning that we have been able to identify is unenlightening on the question how the Board reached its conclusions. As we have stated in earlier cases, our insistence on well-articulated reasoning in Board opinions is only secondarily designed to accommodate the needs of courts seeking to discern irrationality. "Its primary purpose is to impose a discipline upon the agency itself, assuring that it has undergone a process of reasoned decision-making rather than haphazardly reached a result

that could (on one or another basis of analysis) be sustained." *International Association of Bridge, Structural and Ornamental Iron Workers Local No. 111 v. NLRB*, 792 F.2d 241, 247 (D.C.Cir.1986). Moreover, in reviewing the application of an agency's test to cases that come before it, we seek an assurance that the test is in fact guiding agency behavior, rather than merely serving as a cover for arbitrary and capricious decisionmaking. Without a fuller discussion of the critical facts, and absent a more explicit explanation of how these facts form the basis for the legal conclusions reached by the Board in this action, we have no assurance that such reasoned decisionmaking was present in the Board's disposition of this case.

We therefore remand this case for further proceedings consistent with this opinion.

---

a timely fashion. Further, the company challenges the ALJ's finding that the Board was not estopped from pursuing charges against the company because of advice given by an NLRB

agent while charges were pending before the Board, and the ALJ's related decision not to admit certain evidence pertaining to this claim.