1 F.3d 24
 143 L.R.R.M. (BNA) 3001, 303 U.S.App.D.C.
65, 62 USLW 2122,
125 Lab.Cas. P 10,796
 UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION,
AFL-CIO, LOCAL NO. 150-A, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent
Dubuque Packing Company, Inc., Intervenor.
 Nos. 91-1290, 91-1325.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Dec. 14, 1992.
Decided Aug. 10, 1993.
 
 Petitions for Review and Cross-Application for Enforcement of an Order of the National Labor Relations Board (33-CA-5524 & 33-CA-5588).
 Eugene Cotton, Chicago, IL, argued the cause for United Food & Commercial Workers Intern. Union, AFL-CIO, Local No. 150-A, petitioner in No. 91-1290 and intervenor in No. 91-1325. With him on the brief were Irving M. King, Michael H. Slutsky, Chicago, IL, and George R. Murphy, Washington, DC.
 Soren S. Jensen, Lincoln, NE, argued the cause for Dubuque Packing Co., Inc., petitioner in No. 91-1325 and intervenor in No. 91-1290. With him on the brief were Gerard C. Smetana, Chicago, IL, and Michael E. Avakian, North Springfield, VA.
 David A. Fleischer, Attorney, National Labor Relations Bd. ("NLRB"), argued the cause for respondent. With him on the brief were Jerry M. Hunter, General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, NLRB, Washington, DC. Howard E. Perlstein, Washington, DC, also entered an appearance for respondent.
 Before EDWARDS, RUTH BADER GINSBURG, and BUCKLEY, Circuit Judges.
 Opinion for the court filed by Circuit Judge BUCKLEY.
 BUCKLEY, Circuit Judge:
 
 
 1
 Dubuque Packing Company petitions for review of a National Labor Relations Board order holding that it committed unfair labor practices by breaching its duty to bargain with its union regarding the relocation of its "hog kill and cut" operations. We hold that the new standard adopted by the Board for evaluating such claims is an acceptable reading of the National Labor Relations Act and Supreme Court precedents; that the Board's finding that Dubuque owed a duty to bargain was supported by substantial evidence; and that the Board properly applied its new test retroactively to the facts of this case. Hence, we deny Dubuque's petition and enforce the Board's remedial order. In addition, Dubuque's union, the United Food and Commercial Workers International Union, Local No. 150-A, petitions for review of the Board's refusal to consider its unfair labor practice claims regarding a related relocation that Dubuque proposed but did not execute--that of its "pork processing" operation. We find that this claim was properly before the Board on remand from an earlier decision of this court; hence, we grant the UFCW's petition and once again remand this issue.
 
 I. BACKGROUND
 A. Facts and Procedural History
 
 2
 The facts of this case were set forth at length in our earlier opinion, United Food & Commercial Workers Int'l Union, Local 150-A v. NLRB, 880 F.2d 1422, 1423-27 (D.C.Cir.1989) ("UFCW I "); in relevant part, they are these. Beginning about 1977, the Dubuque Packing Company, a processor and packager of beef and pork, began losing money at its Dubuque, Iowa, home plant. In 1978, Dubuque won an agreement from the plant's workers, who were represented by the United Food and Commercial Workers International Union ("UFCW"), requiring the workers to produce at higher rates in return for a one-time cash payment. In August 1980, Dubuque extracted concessions worth approximately $5 million per annum in return for a pledge that it would not ask for further concessions before the September 1, 1982, expiration of the union contract then in effect. In March 1981, however, it again requested concessions, this time in the form of additional productivity increases in its hog kill department.
 
 
 3
 On March 30, 1981, the events at issue here began to unfold. On that date, Dubuque gave six-months' notice, as required by its labor contract, of its intention to close its hog kill and cut operations at Dubuque. Various maneuvers between the company and the UFCW ensued, culminating in the union's rejection of a wage freeze aimed at keeping the Dubuque hog kill and cut operation open. The following day, June 10, 1981, the company announced that it was considering relocating--rather than closing--its hog kill and cut department, and that it was also considering relocating up to 900 Dubuque plant pork processing jobs. The UFCW responded by requesting detailed financial information from Dubuque, which the company refused to provide. Dubuque then advised its employees in writing that they could save their jobs by approving its wage freeze proposal. On June 28, 1981, the wage freeze was resubmitted to the workers for a vote, accompanied by the union leadership's recommendation that it be rejected until Dubuque opened its books. The workers voted overwhelmingly with their union and against the company. Three days later, Dubuque informed the union that its decision to close the hog kill and cut department was "irrevocable."
 
 
 4
 Over the next few months, Dubuque and the UFCW continued to negotiate over Dubuque's proposed relocation of its pork processing operations. On October 1, 1981, Dubuque opened a hog kill and cut operation at its newly acquired Rochelle, Illinois, plant and, two days later, eliminated approximately 530 hog kill and cut jobs at the Dubuque plant. On October 19, 1981, an agreement was signed granting wage concessions for the remaining workers at the Dubuque plant in return for the company's agreement to keep the 900 pork processing jobs in Dubuque and to extend the current labor agreement. By early 1982, however, the company's hope of obtaining new financing had collapsed, taking with it Dubuque's prospects for remaining in business at Dubuque and Rochelle. Both plants were closed and sold on October 15, 1982.
 
 
 5
 On June 26, 1981, and August 7, 1981, the UFCW filed unfair labor practice complaints with the Board. It claimed that Dubuque had refused to bargain in good faith as to both the consummated relocation and the proposed one, objecting especially to the company's alleged duplicity and its refusal to disclose financial data. On June 17, 1985, an administrative law judge ("ALJ") rendered a decision on these complaints. Dubuque Packing Co., Nos. 33-CA-5524, 33-CA-5588 (ALJ June 15, 1985) ("ALJ Decision "), appended to Dubuque Packing Co., 287 N.L.R.B. 499 (1987). The ALJ suggested that Dubuque's conduct may indeed have fallen below the standards of good-faith bargaining, ALJ Decision, 287 N.L.R.B. at 538, 540 n. 132, but he nevertheless held that Dubuque committed no unfair labor practice, id. at 543, because it was under no duty to negotiate over its decision to relocate. Id. at 540. Over two years later, the NLRB summarily affirmed the ALJ, adopting his findings and opinion. Dubuque Packing Co., 287 N.L.R.B. 499 (1987).
 
 
 6
 On review of the Board's decision, we remanded the case, declaring that the Board's opinion had been inadequately explained. UFCW I, 880 F.2d at 1439. At the time, the NLRB had no single standard for determining whether companies were bound to bargain with their unions over plant relocations; rather, it relied on three different minority tests promulgated by various Board members in Otis Elevator Co., 269 N.L.R.B. 891, 1984 WL 36266 (1984) ("Otis II" ). In UFCW I, we held that, given the confusion of the law, we could not trace the Board's reasoning to ensure that its action was not arbitrary. UFCW I, 880 F.2d at 1436-37. We strongly advised, but did not demand, that a single majority rule be adopted by the Board. See id.
 
 
 7
 On remand, the Board unanimously approved a new test that differed from all three set forth in Otis II. Dubuque Packing Co., 303 N.L.R.B. 386, 391, 1991 WL 146795 (1991). It applied its new test to the relocation of the Dubuque hog kill and cut operation and found that a duty to bargain had existed and had been breached. Id. at 398. As a remedy, it ordered Dubuque to pay back wages to all employees terminated as a result of the relocation, from the date of their termination to October 15, 1982, the date operations ceased at Dubuque and Rochelle. Id. at 398-99. The Board, however, declined to apply its new test to the threatened relocation of Dubuque's pork processing operations, finding that issue to be beyond the scope of this court's remand instructions. Id. at 392 n. 19.
 
 
 8
 Both Dubuque and the UFCW petitioned for review of the Board rulings adverse to them, while the NLRB cross-petitioned for the enforcement of its order. In addition to presenting the claims discussed below, Dubuque also argues that the Board's award of backpay must be limited to the period between the relocation of the hog kill and cut operations and the signing of the concessionary agreement. This last claim was not properly raised before the Board, however; hence we are barred from considering it. See 29 U.S.C. Sec. 160(e) (1988) ("No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.").
 
 B. Legal Framework
 
 9
 The critical question in this litigation is whether Dubuque's relocation of its hog kill and cut operation constitutes a mandatory subject of bargaining under the National Labor Relations Act ("NLRA" or "Act"). Although parties to collective bargaining agreements are free to bargain about any legal subject, Congress has imposed on employers and unions "a mandate or duty" to bargain about certain issues. First National Maintenance Corp. v. NLRB, 452 U.S. 666, 674, 101 S.Ct. 2573, 2578, 69 L.Ed.2d 318 (1981). Any "unilateral change as to a subject within this category violates the statutory duty to bargain and is subject to the Board's remedial order." Id. at 674-75, 101 S.Ct. at 2578-79. In particular, two provisions of the NLRA combine to impose on employers a duty to bargain over "wages, hours, and other terms and conditions of employment." Id. at 674, 101 S.Ct. at 2578. First, section 8(a) of the NLRA, 29 U.S.C. Sec. 158(a), defines the activities constituting unfair labor practices by an employer. In relevant part, it provides:
 
 
 10
 It shall be an unfair labor practice for an employer--
 
 
 11
 ....
 
 
 12
 (5) to refuse to bargain collectively with the representatives of his employees....
 
 
 13
 29 U.S.C. 158(a). Second, a definitional provision, section 8(d) of the Act, 29 U.S.C. Sec. 158(d), provides:
 
 
 14
 For purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment ....
 
 
 15
 29 U.S.C. Sec. 158(d) (emphasis added). The narrow issue in this case is whether a plant relocation such as the one executed by Dubuque constitutes a "term[ ] [or] condition[ ] of employment" under section 8(d) of Act; if it does, then Dubuque's failure to bargain in good faith over the relocation constitutes an unfair labor practice under section 8(a)(5). The two critical Supreme Court decisions interpreting "terms and conditions of employment" for these purposes are First National Maintenance Corp. v. NLRB, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), which held that an employer's decision to close a part of its business is not a mandatory subject of bargaining, and Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), which held that the replacement of union labor with subcontracted workers is.
 
 II. DISCUSSION
 A. Dubuque's Petition
 
 16
 Dubuque argues that the Board's new test improperly interprets Supreme Court precedent, that it was improperly applied to these facts, and that the Board erred by retroactively applying its new test to this case. We disagree on all counts.
 
 1. The Legality of the Board's New Test
 
 17
 Dubuque claims the Board erred in finding that its relocation involved a "term[ ] [or] condition[ ] of employment" subject to mandatory bargaining under the NLRA. In particular, it argues that the Board's new test represents an impermissible reading of the Supreme Court's decision in First National Maintenance. In reviewing such claims, we will respect the Board's "policy choices," so long as "its interpretation of what the Act requires is reasonable, in light of the purposes of the Act and the controlling precedent of the Supreme Court." UFCW I, 880 F.2d at 1429.
 
 
 18
 In First National Maintenance, the Court held that the decision by a janitorial services company to close down operations at one customer site for economic reasons was not subject to a duty to bargain. Picking up a theme stressed in a concurring opinion by Justice Stewart in Fibreboard, the Court declared that "there is an undeniable limit to the subjects about which bargaining must take place," First National Maintenance, 452 U.S. at 676, 101 S.Ct. at 2579, and that "Congress had no expectation that the elected union representative would become an equal partner in the running of the business enterprise in which the union's members are employed." Id. The Court later described the area beyond the "undeniable limit" of a union's proper concern as the sphere of an employer's "retained freedom to manage its affairs unrelated to employment." Id. at 677, 101 S.Ct. at 2580.
 
 
 19
 In determining whether a particular decision is sufficiently related to employment that it must be bargained over, First National Maintenance announced and applied a three-part taxonomy:
 
 
 20
 Some management decisions, such as choice of advertising and promotion, product type and design, and financing arrangements, have only an indirect and attenuated impact on the employment relationship. See Fibreboard, 379 U.S. at 223 [85 S.Ct. at 409] (Stewart, J., concurring). Other management decisions, such as the order of succession of layoffs and recalls, production quotas, and work rules, are almost exclusively "an aspect of the relationship" between employer and employee. [Chemical & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 178, 92 S.Ct. 383, 397, 30 L.Ed.2d 341 (1971).] The present case concerns a third type of management decision, one that had a direct impact on employment, since jobs were inexorably eliminated by the termination, but had as its focus only the economic profitability of the [employer's] contract with [its customer], a concern under these facts wholly apart from the employment relationship. This decision, involving a change in the scope and direction of the enterprise, is akin to the decision whether to be in business at all, "not in [itself] primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment." Fibreboard, 379 U.S. at 223 [85 S.Ct. at 409-10] (Stewart, J., concurring). Cf. Textile Workers v. Darlington Co., 380 U.S. 263, 268 [85 S.Ct. 994, 998, 13 L.Ed.2d 827] (1965) ("an employer has the absolute right to terminate his entire business for any reason he pleases"). At the same time, this decision touches on a matter of central and pressing concern to the union and its member employees: the possibility of continued employment and the retention of the employees' very jobs.
 
 
 21
 First National Maintenance, 452 U.S. at 676-77, 101 S.Ct. at 2580. In deciding which decisions in the intermediate category must be negotiated, the Court stated:
 
 
 22
 The concept of mandatory bargaining is premised on the belief that collective discussions backed by the parties' economic weapons will result in decisions that are better for both management and labor and for society as a whole. This will be true, however, only if the subject proposed for discussion is amenable to resolution through the bargaining process. Management must be free from the constraints of the bargaining process to the extent essential for the running of a profitable business. It also must have some degree of certainty beforehand as to when it may proceed to reach decisions without fear of later evaluations labeling its conduct an unfair labor practice.... [I]n view of an employer's need for unencumbered decisionmaking, bargaining over management decisions that have a substantial impact on the continued availability of employment should be required only if the benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of the business.
 
 
 23
 Id. at 678-79, 101 S.Ct. at 2580-81 (citations omitted). The Court then proceeded to hold that a "deci[sion] ... to shut down part of [a] business purely for economic reasons" was not a mandatory subject of bargaining, while "intimat[ing] no view as to other types of management decisions, such as plant relocations, ... which are to be considered on their particular facts." Id. at 686 & n. 22, 101 S.Ct. at 2584 & n. 22. In the course of reaching its decision, the Court did nothing to call into question its earlier reasoning in Fibreboard. In that case, it had held that a manufacturer's decision to subcontract maintenance work that had previously been done by union members was a mandatory subject of bargaining. Fibreboard, 379 U.S. at 215, 85 S.Ct. at 405. The motivation behind the subcontracting decision in Fibreboard was the manufacturer's felt need to cut the labor costs of its operations. Id. at 213, 85 S.Ct. at 403.
 
 
 24
 In these proceedings, the Board set out to enunciate a new legal test "guided by the principles set forth in First National Maintenance." Dubuque Packing, 303 N.L.R.B. at 390. It adopted the following standard for determining whether "a decision to relocate [bargaining] unit work," id., is a mandatory subject of bargaining:
 
 
 25
 Initially, the burden is on the [NLRB] General Counsel to establish that the employer's decision involved a relocation of unit work unaccompanied by a basic change in the nature of the employer's operation. If the General Counsel successfully carries his burden in this regard, he will have established prima facie that the employer's relocation decision is a mandatory subject of bargaining. At this juncture, the employer may produce evidence rebutting the prima facie case by establishing that the work performed at the new location varies significantly from the work performed at the former plant, establishing that the work performed at the former plant is to be discontinued entirely and not moved to the new location, or establishing that the employer's decision involves a change in the scope and direction of the enterprise. Alternatively, the employer may proffer a defense to show by a preponderance of the evidence: (1) that labor costs (direct and/or indirect) were not a factor in the decision, or (2) that even if labor costs were a factor in the decision, the union could not have offered labor cost concessions that could have changed the employer's decision to relocate.
 
 
 26
 Id. at 391.
 
 
 27
 We note at the outset that no claim has been presented to us regarding the legality of the Board's test under section 10(c) of the NLRA, 29 U.S.C. Sec. 160(c), which provides that the Board must find an unfair labor practice by a "preponderance of the testimony." Because no section 10(c) claim is presented, we must view the factual elements of the Board's test without regard to who must prove them. The only question facing us, then, is whether the Board could properly find a duty to bargain where all the elements included in its test have been proved.
 
 
 28
 The Board's test involves three distinct layers of analysis. First, the test recognizes a category of decisions lying "at the core of entrepreneurial control," Fibreboard, 379 U.S. at 223, 85 S.Ct. at 409 (Stewart, J., concurring), in which employers may unilaterally take action. Specifically, the test exempts from the duty to bargain relocations involving (1) "a basic change in the nature of the employer's operation," (2) "a change in the scope and direction of the enterprise," (3) situations in which "the work performed at the new location varies significantly from the work performed at the former plant," or (4) situations in which "the work performed at the former plant is to be discontinued entirely and not moved to the new location." Dubuque Packing, 303 N.L.R.B. at 391.
 
 
 29
 This language would appear broad enough to cover key entrepreneurial decisions such as setting the scale (e.g., the quantity of product produced) and scope (e.g., the type of product produced) of the employer's operations, and determining the basic method of production. Moreover, as to these issues, the Board's test requires an analysis based on the objective differences between the employer's old and new operations. It asks whether various types of "basic change," "change," "vari[ance]," or "discontinu[ance]" were involved in the relocation. Where such objective differences appear, an entrepreneurial decision is deemed to have been taken, and the employer is permitted to relocate without negotiating.
 
 
 30
 The second layer of the Board's analysis is a subjective one. Cf. Dubuque Packing, 303 N.L.R.B. at 392 (referring to the employer's "motivation for the relocation decision"). Under this heading, the relevant question is whether "labor costs (direct and/or indirect) were ... a factor" in the employer's relocation decision. Id. at 391. As illustrated by the Board, this analysis will distinguish relocations motivated by labor costs from those motivated by other perceived advantages of the new location. Compare id. at 390 n. 9 (collecting cases in which the relocation was motivated by labor costs) with id. at 390 n. 10 (collecting cases in which the decision was motivated by other factors).
 
 
 31
 The third layer includes a futility provision. As we shall see below, the Board permits an employer to relocate without negotiating where its union either would not or could not offer sufficient concessions to change its decision. See Dubuque Packing, 303 N.L.R.B. at 391. Also, the Board has pledged to consider circumstances such as the need to implement a relocation "expeditiously" in determining whether bargaining over a relocation has reached "a bona fide impasse," id. at 392; that is, the point at which a party may act unilaterally.
 
 
 32
 Dubuque objects that the Board's test is inconsistent with First National Maintenance. Its argument tends toward the proposition that a per se rule exempting relocation decisions from the duty to bargain is implicit in First National Maintenance 's reasoning, if not its holding. Dubuque's general objection is that the Board's test is insufficiently protective of management prerogatives, both on its face and because it is not capable of certainty in application. Dubuque pointedly reminds us that First National Maintenance held that employers "must have some degree of certainty beforehand" as to which decisions are and are not subject to a bargaining duty. See First National Maintenance, 452 U.S. at 679, 101 S.Ct. at 2581. More specifically, Dubuque argues that relocation decisions must be exempt from the duty to bargain because they involve the reallocation of capital, observing that allocations of capital are "core managerial decisions." See Brief for Dubuque at 38.
 
 
 33
 We pause to emphasize that our analysis of the Board's test is premised on our resolution of an important ambiguity in the Board's statement of its second affirmative defense. As stated by the Board, that defense requires an employer to establish that "the union could not have offered labor cost concessions that could have changed the employer's decision to relocate." Dubuque Packing, 303 N.L.R.B. at 391 (emphasis added). On its face, this language might be read as an impossibility exception--a provision allowing an employer to eschew negotiations only if its union could not possibly have changed the relocation decision no matter how accommodating the union might have been at the bargaining table. This reading is strengthened by the Board's illustration of the defense, which involves a case in which an employer "would not remain at the present plant because ... the costs for modernization of equipment or environmental controls were greater than [the value of] any labor cost concessions the union could offer." Id. (emphasis added).
 
 
 34
 Despite this evidence, we think this defense was intended to cover situations in which bargaining would be futile, as well as ones in which it would be impossible for the union to persuade the employer to rescind its relocation decision. Immediately after setting forth its test and the above illustration, the Board stated that under the second affirmative defense, "an employer would have a bargaining obligation if the union could and would offer concessions that approximate, meet, or exceed the anticipated costs or benefits that prompted the relocation decision." Dubuque Packing Co., 303 N.L.R.B. at 391 (emphasis added). Furthermore, in the next succeeding sentence and a footnote appended to it, the Board stated:
 
 
 35
 As an evidentiary matter, an employer might establish that it has no decision bargaining obligation, even without discussing the union's position on concessions, if the wage and benefit costs of the unit employees were already so low that it was clear on the basis of those figures alone that the employees could not make up the difference. For example, if a relocation of unit work would save an employer a projected $10.5 million in costs for equipment modernization and environmental controls (quite apart from any labor costs), and if the employer's present labor costs totaled $10 million, then even if the employees were willing to work for free, the union could not offer sufficient labor cost concessions to offset the equipment and environmental savings.
 
 
 36
 Id. at 391-92 & n. 13 (footnote relocated into text) (emphasis added). We gather from this that showing the impossibility of obtaining sufficient concessions is simply one means of demonstrating the futility of bargaining as an evidentiary matter. And we note that the Board's aside to the effect that an employer might establish that it has no bargaining obligation, "even without discussing the union's position on concessions," implies that an employer might also establish the same proposition through a discussion of "the union's position on concessions." As we read it, the Board's test holds that no duty to bargain exists where bargaining would be futile--either because the union was unable to offer sufficient concessions, or because it was unwilling to do so.
 
 
 37
 Viewing the Board's test through the lens of this interpretation, we find it sufficiently protective of an employer's prerogative to manage its business. Under First National Maintenance, employers may be required to negotiate management decisions where "the benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of the business." First National Maintenance, 452 U.S. at 679, 101 S.Ct. at 2581. The Board's test exempts from the duty to negotiate relocations that, viewed objectively, are entrepreneurial in nature. It exempts decisions that, viewed subjectively, were motivated by something other than labor costs. And it explicitly excuses employers from attempting to negotiate when doing so would be futile or impossible. What is left are relocations that leave the firm occupying much the same entrepreneurial position as previously, that were taken because of the cost of labor, and that offer a realistic hope for a negotiated settlement. The Board's determination that bargaining over such decisions promises benefits outweighing the "burden[s] placed on the conduct of [an employer's] business" was in no way unreasonable.
 
 
 38
 Similarly, the Board was also justified in finding that its test accords with Supreme Court precedent. A relocation satisfying the three layers of the Board's test will resemble the subcontracting decision held subject to a mandatory bargaining duty in Fibreboard in three distinct ways: Because of the new test's objective component, such a relocation will not "alter the Company's basic operation," Fibreboard, 379 U.S. at 213, 85 S.Ct. at 404, in a way that implicates the employer's "core of entrepreneurial control," id. at 223, 85 S.Ct. at 409 (Stewart, J., concurring); because of the new test's subjective component, "a desire to reduce labor costs" will lie "at the base of the employer's decision," see First National Maintenance, 452 U.S. at 680, 101 S.Ct. at 2581 (discussing Fibreboard ); and because of the new test's exclusion of situations in which bargaining would be futile, there will be some prospect of resolving the relocation dispute "within the collective bargaining framework." Fibreboard, 379 U.S. at 213-14, 85 S.Ct. at 404. Like its balancing of burdens and benefits, the Board's finding that its test accords with precedent is fully defensible.
 
 
 39
 Dubuque counters that relocation decisions should not be treated the same as the subcontract considered in Fibreboard because they will differ from that arrangement on a crucial point--relocations involve the expenditure of capital. Cf. Fibreboard, 379 U.S. at 225, 85 S.Ct. at 410 (Stewart, J., concurring) ("larger entrepreneurial questions [such] as ... how capital shall be invested in fixed assets " not governed by Fibreboard 's holding) (emphasis added); id. at 213, 85 S.Ct. at 404 (noting that "[n]o capital investment was contemplated" in connection with the subcontract). Furthermore, as Dubuque points out, key portions of the First National Maintenance opinion relied on Justice Stewart's concurrence in Fibreboard, which was particularly solicitous of management prerogatives over capital expenditure. See, e.g., First National Maintenance, 452 U.S. at 676-77, 101 S.Ct. at 2579-80 (citing Fibreboard, 379 U.S. at 223, 85 S.Ct. at 409 (Stewart, J., concurring)).
 
 
 40
 For several reasons, we remain unconvinced. First, the Board's test exempts from the duty to bargain relocations in which "the work performed at the new location varies significantly from the work performed at the former plant." Dubuque Packing, 303 N.L.R.B. at 391. Under this standard, relocations involving a sufficiently altered pattern of fixed-capital use (such as a shift from a labor-intensive production line to a fully automated factory) would appear exempt from the bargaining duty. Cf. Local 777, Democratic Union Org. Comm., Seafarers Int'l Union v. NLRB, 603 F.2d 862, 884 (D.C.Cir.1978) ("Local 777 ") (stating that "major shifts in the capital investment or corporate strategy of a company are not mandatory bargaining subjects"). Second, many "terms and conditions of employment" over which employers are plainly bound to bargain involve the expenditure of "capital." Unless management rights are impermissibly invaded every time a union bargains for a breakroom water-cooler or shop-floor safety equipment, the realm of mandatory bargaining must include at least some decisions involving capital expenditures. Third, while First National Maintenance did reflect the influence of Justice Stewart's Fibreboard opinion, it did not reiterate that opinion's specific concerns with management's prerogative over the expenditure of capital, or otherwise indicate that a line protecting all decisions to expend capital must be drawn. Given this, and the deference owed the Board's policy choices, see UFCW I, 880 F.2d at 1429, we find that the Board's test does not impermissibly fail to protect management's prerogatives over capital investment. The dicta Dubuque cites are too thin to bear the weight placed on them.
 
 
 41
 Dubuque's final contention is that the test is so imprecise that employers are denied the degree of certainty or guidance that it believes the Supreme Court mandated in First National Maintenance. See 452 U.S. at 679, 101 S.Ct. at 2581. While we can agree that First National Maintenance affirms management's need for "some degree of certainty" so that it "may proceed to reach decisions without fear of later evaluations labeling its conduct an unfair labor practice," id. (emphasis added), this does not require that the Board establish standards devoid of ambiguity at the margins. The test announced in Dubuque Packing provides more than the "some" degree of certainty required by the Supreme Court. It establishes rules on which management may plan with a large degree of confidence; and while the test undoubtedly leaves areas of uncertainty between relocation decisions that are clearly within the exclusive prerogatives of management and those that are equally clearly subject to negotiation, these will in time be narrowed through future adjudications. We therefore conclude that the standard adopted by the Board was a reasonable policy choice and that its decision to proceed by adjudication, not rulemaking, was also within its discretion. See NLRB v. Bell Aerospace Co., 416 U.S. 267, 294, 94 S.Ct. 1757, 1772, 40 L.Ed.2d 134 (1974) (upholding a decision to proceed by adjudication where the relevant facts "vary widely depending on the company or industry"); see also Bechtel v. FCC, 957 F.2d 873, 881 (D.C.Cir.1992) (affirming that an agency may "choose to make new policy through either rulemaking or adjudication").
 
 
 42
 Finally, we find no fatal uncertainty in the Board's test as it applies to these facts. As we explain below, the Board's ruling easily survives Dubuque's contention that the test's requirements were not met in regard to its particular relocation. Employers should have no trouble understanding that actions such as Dubuque's run afoul of the Board's newly articulated standard.
 
 
 43
 2. The Application of the Board's Test to Dubuque
 
 
 44
 Dubuque next contends that the Board improperly applied its test to the facts of this case and that under the new standard, properly applied, its actions did not give rise to a bargaining duty. In addressing this contention, we are required by statute to uphold "the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole." 29 U.S.C. Sec. 160(f).
 
 
 45
 Dubuque objects, first, to the Board's finding that its relocation did not constitute a change in the scope and direction of its business. It relies for support on the ALJ's finding that the Rochelle plant was a "smaller, newer, more modern ..., better laid out" facility and his conclusion "that [Dubuque's] relocation of the hog kill and cut to Rochelle clearly turned on a fundamental change in the scope, nature, and direction of [its] business of which labor costs were but a single important factor." ALJ Decision, 287 N.L.R.B. at 538. The Board rejected this conclusion, stating that "[t]here is no evidence that the relocation decision was accompanied by a basic change in the nature of the employer's operation." Dubuque Packing, 303 N.L.R.B. at 393.
 
 
 46
 The Board's position enjoys ample support in the record. In fact, its rejection of the ALJ's conclusion is specifically supported by the ALJ's findings. The ALJ stated that Dubuque
 
 
 47
 used the Rochelle facility to substantially replace the Dubuque facility. As production in Rochelle increased, there was a corresponding reduction at Dubuque until the hog kill and cut processing departments and related operations there were completely phased out. Larry J. Tangeman, general plant superintendent at Dubuque, became superintendent of the Rochelle facility and about 13 members of Dubuque management also were transferred to Rochelle, as was certain production equipment. The purposes of the Rochelle plant, to slaughter hogs, dress carcasses, and to process pork into hams, bacon, and sausage, were the same as at the Dubuque plant.
 
 
 48
 ALJ Decision, 287 N.L.R.B. at 529. Indeed, in view of these facts, the ALJ felt it necessary to "find" on the record that "the transfer ... did not constitute subcontracting." Id. at 529 n. 82. Aside from the ALJ's conclusory statement, Dubuque points to nothing indicating that the Dubuque and Rochelle operations were objectively dissimilar enough (in scale of operations for example) for the relocation to constitute a "basic change in the nature of the employer's operation" as that phrase is used in the test. See Dubuque Packing, 303 N.L.R.B. at 391. Viewed as a whole, the record offers substantial support for the Board's position.
 
 
 49
 Dubuque's second contention is that because "the record ... is very clear that the union 'would not' offer labor concessions," bargaining would have been futile; hence it was not required. Brief for Dubuque at 40. Dubuque cites for support Local 777, where we observed:
 
 
 50
 It would make a mockery of the labor law for this court to hold that the Company had committed an unfair labor practice by refusing to bargain when the Union gave a public demonstration of its intransigent opposition to a management proposal, attempted to thwart the realization of this proposal by political action, and conditioned any bargaining on an illegal recognition of it as collective bargaining representative.
 
 
 51
 Local 777, 603 F.2d at 888 (emphasis in original).
 
 
 52
 While we agree that our precedent, like the Board's test, relieves employers from any duty to bargain in the face of a union's adamantine intransigence, that principle has no bearing here. As counsel for the UFCW pointed out at oral argument, the UFCW "could, would, and did" accept concessions--in 1978, in August 1980, and again in October 1981--all in a vain attempt to keep the Dubuque facility open. Indeed, the vote that led to Dubuque's "irrevocable" decision to relocate was not a vote to categorically refuse Dubuque's overtures, but a vote to insist on financial disclosure as a prelude to bargaining. The Board's finding that good-faith bargaining between Dubuque and the UFCW might not have been futile was substantially supported by the record.
 
 3. Retroactivity
 
 53
 Finally, Dubuque argues that the Board erred by "retroactively" employing its new test in this case. Again, we disagree.
 
 
 54
 Our formulation of the standard for evaluating challenges to the retroactive application of a ruling from an agency adjudication has varied. Compare Retail, Wholesale & Dep't Store Union v. NLRB, 466 F.2d 380, 390 (D.C.Cir.1972) (applying a five-factor test) with Consolidated Freightways v. NLRB, 892 F.2d 1052, 1058 (D.C.Cir.1989) (recognizing "a general principle" that retroactive application of rules is permitted "absent any manifest injustice") (internal quotation marks omitted) with District Lodge 64, Int'l Ass'n of Machinists v. NLRB, 949 F.2d 441, 447 (D.C.Cir.1991) (applying a three-factor test based on Chevron Oil Co. v. Huson, 404 U.S. 97, 106-07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971)). What has not varied is our consistent willingness to approve the retroactive application of rulings that do not represent an "abrupt break with well-settled policy" but merely "attempt to fill a void in an unsettled area of the law." Local 900, Int'l Union of Electrical Workers v. NLRB, 727 F.2d 1184, 1195 (D.C.Cir.1984) (internal quotation marks and brackets omitted); see also, e.g., District Lodge 64, 949 F.2d at 447-48 (permitting retroactivity where "Board precedent was neither clear nor consistent" at the relevant time); Clark-Cowlitz Joint Operating Agency v. FERC, 826 F.2d 1074, 1083 (D.C.Cir.1987) (en banc) (permitting retroactive application of a new rule where the prior rule did not "rise to the level of a well established practice") (internal quotation marks omitted). Indeed, an agency's authority to proceed by adjudication, as opposed to rulemaking, see Bell Aerospace Co., 416 U.S. at 294, 94 S.Ct. at 1772, implies a power to fill interstices in the law by proceeding case by case. Cf. id. (noting that where the relevant facts "vary widely depending on the company or industry," the Board "has reason to proceed with caution, developing its standards in a case-by-case manner with attention to the specific circumstances").
 
 
 55
 Although our multi-factor tests have been stated in terms of a balancing of co-equal factors, each includes one that, in practice, has been given primary importance; namely, the critical question of whether the challenged decision "creates a new rule, either by overruling past precedents relied upon by the parties or because it was an issue of first impression." See District Lodge 64, 949 F.2d at 447 (setting forth the first prong of its three-factor test and noting that this factor "parallel[s]" the first two of Retail Union 's five factors). Although we have retained the authority to disallow on equitable grounds the retroactive application of rules that do not represent a reversal of precedent or constitute an issue of first impression, to our knowledge we have never exercised that authority. As a practical matter, where an agency ruling seeks only to clarify the contours of established doctrine, we will almost per force allow its retroactive application.
 
 
 56
 In this case, the Board's test merely clarifies the line between relocation decisions that, because they are analogous to subcontracting arrangements, are subject to a duty to bargain and those that, because they are analogous to partial closings, are not. At the time Dubuque announced its "irrevocable" decision to relocate, the question of whether relocation decisions must be negotiated was an old one and the existence of this legal "interstice" was apparent. By that time, July 1, 1981, both Fibreboard and First National Maintenance had been decided. The Court's opinion in the latter had called into question the Board's former practice of "consistently holding that relocation of work from one plant to another was a mandatory subject of bargaining," UFCW I, 880 F.2d at 1429. See id. at 1431. First National Maintenance had also expressly reserved judgment on "management decisions[ ] such as plant relocations." 452 U.S. at 686 n. 22, 101 S.Ct. at 2584 n. 22.
 
 
 57
 Moreover, the gap in the law that had already been opened when Dubuque acted was not closed until the announcement of the test we approve today. In the intervening years, a Board majority never embraced a standard under which Dubuque's failure to bargain would have been lawful. Thus, the Board's test does not "create[ ] a new rule, either by overruling past precedents relied upon by the parties or because it was an issue of first impression," District Lodge 64, 949 F.2d at 447; rather it "fill[s] a void" in the law. Local 900, 727 F.2d at 1195. We have observed before that
 
 
 58
 [c]ircumstances such as these are the stuff that adjudications are made of: the law is unclear; opposing parties mount reasonable arguments on both sides; the adjudicator says what the law is. In such circumstances, the general rule [is] that judicial or administrative precedents apply not only prospectively but to cases pending at the time they are decided.
 
 
 59
 Atchison, Topeka & Santa Fe Ry. Co. v. ICC, 851 F.2d 1432, 1437 (D.C.Cir.1988) (brackets and quotation marks omitted). Because we find on these facts no special inequity in allowing this interstitial ruling to apply retroactively, we affirm the Board's application of its new test to the present case.
 
 
 60
 In closing, we recognize the possibility that our precedents regarding the retroactive application of agency adjudications may require revision in light of the Supreme Court's recent decision in Harper v. Virginia Dep't of Taxation, --- U.S. ----, ----, 113 S.Ct. 2510, 2517-19, 125 L.Ed.2d 74 (1993), but note that there is no need to revisit them here. Harper abolished exceptions to the retroactive application of judicial rulings in civil cases and rejected the three-factor retroactivity test of Chevron Oil Co. v. Huson, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), that we have deemed "substantively indistinguishable" from our traditional standards for testing administrative retroactivity, District Lodge 64 v. NLRB, 949 F.2d at 447. Harper, --- U.S. at ----, 113 S.Ct. at 2517-19. We need not wrestle with this question, however, because if applicable to agency adjudications, Harper would mandate the retroactive application of the Board's test that we find to be consistent with our existing circuit precedent.
 
 B. The UFCW Petition
 
 61
 The UFCW petitions for review of the Board's refusal to consider the union's complaints of unfair labor practices in connection with Dubuque's proposed relocation of its pork processing operation. Although the Board acknowledged that the union had presented claims concerning both proposed relocation decisions in UFCW I, it "decline[d] to pass" on the pork processing claims "on the ground that [they] go beyond the scope of the issues remanded to us by the court of appeals." Dubuque Packing, 303 N.L.R.B. at 392 n. 19. The Board supported this ruling by noting that (1) our discussion in the earlier opinion focused on the consummated relocation of the hog kill and cut operation, not the proposed relocation of the pork processing operation; (2) our review of issues to be determined on remand did not include the pork processing issues; and (3) any decision on these matters would raise "distinct issues" including "difficult remedial issue[s]" concerning the remedy for bargaining in bad faith over a proposed relocation that had been averted through a concessionary agreement. Id. The Board supposed that if we had wished it to address such issues we would have said so directly.
 
 
 62
 On reviewing our earlier decision, we acknowledge that our ruling was not as explicit as it should have been. The Board concedes, however, that the union presented all of its claims in the earlier appeal and that we did not dispose of the pork processing relocation controversy at that time. It should have been evident, then, that when we remanded "this case for further proceedings consistent with this opinion," UFCW I, 880 F.2d at 1439, it was our intention to remand all of it.
 
 
 63
 Accordingly, we grant the UFCW's petition for review; we set aside that part of the Board's order that declines to consider the UFCW's claims of unfair labor practices in connection with Dubuque's proposed pork processing relocation; and we remand that issue to the Board for a determination of its merits. Out of an excess of caution, we point out that this remand covers all properly preserved claims that have yet to be disposed of on their merits (our references to "900 pork processing" jobs have been intended as an identifier, not as a finding of fact). Also, as our earlier decision set aside the entirety of the Board's first order, the Board should adjudicate these claims as they first appeared on its docket on appeal from the ALJ's 1985 decision.
 
 III. CONCLUSION
 
 64
 For the foregoing reasons, we deny Dubuque's petition for review, enforce the Board's remedial order against Dubuque, grant the UFCW's petition for review, and remand to the Board the issue of Dubuque's duty to bargain over its proposed pork processing relocation.
 
 
 65
 So ordered.